IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PHILLIP COOK, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| -vs- | ) |
| | ) Civil Action No.  06-38 |
| UNITED STATES DRUG ENFORCEMENT | ) |
| ADMINISTRATION AGENT FRANK DREW, in | ) |
| his individual capacity; and PENNSYLVANIA | ) |
| STATE TROOPER JEFFREY BRAUTIGAM in his | ) |
| individual capacity, | ) |
| | ) |
| | ) |
| Defendants. | ) |

AMBROSE, Chief District Judge.


OPINION and ORDER OF COURT

SYNOPSIS

In this civil rights action, Plaintiff, an African-American male, claims that

Defendant, federal law enforcement officers, illegally searched and seized his

belongings on the premises of the Radisson hotel.   Plaintiff claims that the search

and seizure violated his rights under the Fourth Amendment to the Constitution,

and that the subsequent retention of his property violated his due process rights

under the Fifth and Fourteenth Amendments.  Plaintiff further claims discrimination

in violation of the equal protection clause of the Fourteenth Amendment.   Against

1

Defendant Drew alone, he asserts a separate due process claim under the Fifth Amendment.[1]

Before the Court is a Motion for Summary Judgment filed by Defendants Brautigam and Drew (Docket No. 68).  Also pending is Plaintiff's Cross-Motion against those Defendants (Docket No. 71).   For the following reasons, Defendant's Motion will be granted in part, and Plaintiff's denied.

## I. FACTS

In the interest of providing complete background, I recount here several facts that are not material to summary judgment.  Unless otherwise indicated, the following facts are undisputed.

Defendant Brautigam is a Pennsylvania State Police Officer, who was deputized as a federal task force officer in 2000, but not as a Drug Enforcement Administration ("DEA") agent.  Defendant Drew was, at all pertinent times, a DEA agent.   Drew was Brautigam's immediate supervisor.   Both Defendants were members of a federally funded interdiction unit, which focuses on individuals transporting drugs or currency via various means, including hotels.  The unit is a resource that is available for all hotels in the Pittsburgh area.

Plaintiff rented a room at the Radisson beginning September 18, 2003.

---

[1] All Defendants other than Brautigam and Drew have been dismissed from this litigation. For housekeeping purposes, I note that it is entirely unclear that Count V, a Fifth Amendment due process property deprivation claim against Drew alone, is any different from Count IV, which asserts Fifth and Fourteenth Amendment due process property deprivation claims against Drew and Brautigam.  Plaintiff identifies no distinct factual or legal bases for the two Counts.  I assume, therefore, that the claims were asserted separately because Count IV initially included now-dismissed defendants.   I will consider Count V as subsumed in Count IV.

Although the hotel does not have any record of his checkout, Defendants assert that he rented the room until January 7, 2004.  Radisson policy provides that a guest may be evicted due to an outstanding debt.   In the event a guest's credit card is declined, it is Radisson policy to contact the guest to secure payment.   If the Radisson is unable to contact the guest, policy dictates that the Radisson change the lock on the hotel room so that the guest is required to come to the front desk. When the guest arrives at the front desk, the Radisson secures payment prior to permitting the guest to return to his room.  If a Radisson employee suspects that a guest has left the hotel without checking out at the front desk, it is policy to see if any property is left in the room.  Next, it is policy to see if the guest is returning. If the guest cannot be reached or is returning at a later time, it is policy to inventory the items left in the room and lock the items in a secure area until the guest returns. If the Radisson believes a guest is not returning, it is policy to remove all the guest's belongings from the room, inventory such items, and secure such items so that the Radisson may rent the room to another guest.

Plaintiff left the Radisson sometime between December 31, 2003 and January 2, 2004 for a business trip in Atlanta.  Plaintiff anticipated that he would be out of town for two to four days, but he did not return until January 10, 2004.  Prior to Plaintiff's return, Michael Vento, the hotel's general manager, was advised by a clerk that Plaintiff's credit card was declined.  Vento attempted to verify the card, and it was declined again.  Vento telephoned Plaintiff several times on his cell phone, for a two-day period.   Plaintiff had accumulated a bill of between $1,800.00 and

$2,000.00, but had left $1,000.00 with the hotel, which the hotel had indicated to him would probably cover him until he returned.   Vento was unable to reach Plaintiff, but left him several voice mails, indicating he needed to verify payment of his room at the Radisson.  Vento asked front desk employees whether Plaintiff had indicated that he would return; Vento avers that nobody knew if Plaintiff would return, and Plaintiff alleges that he told Radisson employees that he would return. In addition, Vento contacted the credit card verification center, and was advised that Plaintiff's credit card was stolen.  Vento concluded that Plaintiff was unwilling or unable to satisfy the balance for his room, along with incidental charges.  Plaintiff admitted at his deposition that while he was in Atlanta, he did not make arrangements to pay his outstanding Radisson bill.  He further testified that he was aware on or about January 8, 2004, that his credit card was declined, because someone at the Radisson had contacted him.  Plaintiff claimed that he had two credit cards on file at the Radisson, and did not report either of those credit cards as stolen.

On Friday, January 9, 2004, at 7:30 PM, pursuant to Radisson policy, Vento, a security officer, and Executive Chef Jim Strickler entered room 614 and inventoried and removed all of Plaintiff's personal items from the room.  When asked whether he had authority to enter room 614, Vento replied, "right, because of payment not being made."  Vento testified that he opened a black bag, and found cash.  He took $2,000.00 from the $16,000.00 that he found in the room in order to pay Plaintiff's outstanding bill, because he did not know if Plaintiff was returning to the hotel.

4

This payment was reflected in Plaintiff's Radisson invoice.  The last day Plaintiff had paid for the room was January 7, 2004.  Following Vento's application of the $2,000.00, the account was deemed settled and paid up as of January 9, 2004, according to the incident report proffered by Plaintiff.  This left the hotel owing Plaintiff $118.00.

The remaining $14,000.00 and jewelry were placed in a safety deposit box at the Radisson.  The box required two keys to open.  Plaintiff's other personal belongings were secured in the Radisson's storage area.  When Radisson employees left the room on January 9, 2004, it was empty so that it could be rented to another guest.  Plaintiff testified in his deposition that when he left for Atlanta, the following items were left in the room: 10-11 pairs of boots, 3 pairs of sneakers, 7 pairs of dress shoes, at least 2 suits, 10-15 pairs of jeans, at least 15 sweaters, 5-6 coats, 2 leather jackets, a Klaus Kobec watch, two 14-carat rings, two Toshiba laptops, various reading material, two briefcases, one with $16,000.00 cash, and photos of his daughter.

Vento testified that it was not "normal" for there to be $16,000.00 in a hotel room in that hotel, and he did not want to be responsible for it.   Paul Martin, the hotel Director of Security/Loss Prevention, testified that it was "suspicious" to find a large sum of money and be unable to locate the guest.  Vento and Martin agreed that the local authorities should be contacted, and they decided to contact Brautigam, who was the Radisson's contact in Pittsburgh's Interdiction Unit.

Martin   directed   Radisson   security   officer   Jason   Contreras   to   contact

Brautigam regarding the large amounts of money found in room 614.   On either Friday or Saturday morning, January 10, 2004, Contreras contacted Brautigam regarding the money; this was Brautigam's first notification of anything relating to Plaintiff.    The Defendants were not involved in the inventory or removal of Plaintiff's belongings, although Defendant Drew may have been present in the room at some point at the same time as Plaintiff's belongings.  Brautigam, however, did not instruct any Radisson employee to enter room 614, or to remove any of Plaintiff's items from the room.  On January 9, 2004, the Defendants did not enter Plaintiff's room. The Defendants went to the Radisson for the first time regarding Plaintiff on Saturday, January 10, 2004.  When Brautigam and Drew and Pennsylvania State Trooper Paul Schuhan arrived at the Radisson, they spoke with Contreras.

Brautigam and Drew were provided with the following information: Plaintiff had been renting a room at the Radisson; Vento had telephoned Plaintiff on January 8, 2004, and advised him that his hotel payment was overdue and payment was needed for the Radisson to secure the room; Vento ran the credit card number that Plaintiff had provided, and discovered the credit card was reported stolen; from January 7 or 8, 2004 until January 10, 2004, Vento was unable to reach Plaintiff via telephone; Plaintiff left a Cadillac Escalade in the Radisson's parking lot; in accordance with Radisson's policy, Plaintiff's personal belongings were removed from room 614 and placed in storage on January 9, 2004; and during the removal hotel security discovered $16,000.00 in cash.  When Brautigam and Drew arrived at the Radisson on Saturday, the $14,000.00 remaining in cash, along with Plaintiff's

jewelry, were in a safety deposit box in the Radisson's office.

At some point, Brautigam and Drew were taken to room 622, where their cell phones would work, and where there was more light.  Room 622 is in another tower, away from room 614, and close to the storage area.   Defendant Drew contacted Plum Police Department Canine Officer Lee Temple and asked him to respond to the Radisson  with  a  drug  sniffer  dog.   In addition, Drew telephoned the El Paso Intelligence Center ("EPIC") to learn whether they had any information on Plaintiff or Wendell Harris, who owned the vehicle that Plaintiff left at the Radisson.  The EPIC check  showed  that  the  U.S.  Customs  Service  had  reported  that  Mr.  Harris  was involved in distributing crack cocaine in the Cleveland, Ohio area.  A report by the Bureau of Alcohol, Tobacco, and Firearms indicated that Mr. Harris was an armed convicted  felon  using  fraudulent  identification,  and  the  DEA's  NADDIS  system revealed that Mr. Harris was a member of a crack cocaine distribution organization operating in Cleveland and arrested in 1991 for possession of cocaine and in 1995 for narcotics trafficking.  The EPIC check also revealed that according to the U.S. Secret Service, Plaintiff had been involved in several bank/credit card fraud and financial fraud scams dating back to 1995, and a report of the Cleveland Police Department showed that he was arrested for credit card fraud in April of 2003.

Drew telephoned a detective with the Cleveland Police Department, and was advised that Plaintiff was on bail, and was in violation of his bail terms by traveling to  Pennsylvania.   Plaintiff  denies  that  the  travel  violated  his  bail  terms.   The detective further advised that in April of 2003, he executed a search warrant in

plaintiff's home in Ohio, and suspected that many records were missing and in Plaintiff's possession.   Brautigam contacted the state police, and learned that Plaintiff had a prior criminal record.  He was then shown the briefcase where Vento had found the $16,000.00.    In the briefcase, Brautigam found various financial documents, which revealed numerous financial transactions under different names and companies, bank accounts of others with large amounts of cash having been deposited and withdrawn, and documents with personal information of other individuals, including social security numbers and copies of their drivers licenses. Neither Defendant accessed Plaintiff's computer.

When Officer Temple arrived at the Radisson, he hid the money in the Radisson's office, and ran the drug dog through the office; the dog gave an immediate alert for the presence of narcotics on the currency.[2]    Once the dog alerted for the presence of narcotics, Drew informed Vento that he wanted to retain the $14,000.00 and jewelry for possible forfeiture action.  Vento did not want to release the jewelry and cash until he spoke with Radisson corporate counsel, and requested something in writing before he released the money.  Drew requested that the Radisson secure the money until he could return with paperwork to suffice for the Radisson's legal department.  The Radisson agreed to secure the cash, and it remained locked in the safety deposit box.   One of the two keys required to unlock the box was given to Brautigam.  The Radisson kept the other key.  The Defendants also wanted to take the financial records and laptop computer as

---

[2]A fact denied without reference to the record must be viewed as undisputed.

evidence; Brautigam wanted to ascertain why Plaintiff left $16,000 in a hotel room and had the financial documents that they had found, and further his investigation. The Defendants believed that Plaintiff may have been involved in a financial fraud, and believed it was necessary to further investigate whether the documents and computer were used in committing a crime or presently being used to commit a crime.

On January 10, 2004, the Radisson transferred to the Defendants the following items from its storage area, to which only security personnel had access: one light brown computer bag containing one laptop computer; one brown leather briefcase containing business and personal documents; and one white plastic container containing various photographs and documents.  The Defendants did not believe a search warrant was necessary for any of the items that they looked at or took, because the property they took was under the Radisson's control and the Radisson employees allowed them to view and take the property.  On January 10, 2004, Brautigam did not take any item directly from Plaintiff or Room 614.   When Brautigam left the Radisson on January 10, 1004, he advised the Radisson to have Plaintiff contact him if he returned to the Radisson.  No forfeiture proceeding could begin at that time, because they did not have the $14,000 cash, and an ion scan needed to be performed on the currency.

Plaintiff returned to the Radisson either around midnight on January 10, or early morning Sunday, January 11, 2004.  When he returned, he claimed he went to the front desk to have his room key renewed and a Radisson security officer advised

him that the federal authorities, DEA, and some other agency came to the Radisson and took all his items, and Plaintiff needed to contact Brautigam.   Sometime on Sunday, January 11, 2004, Plaintiff called Brautigam, who requested a meeting with Plaintiff on Monday, January 12, 2004.  When Plaintiff requested return of his items, Brautigam advised Plaintiff that he needed to ask Plaintiff some questions, and upon Plaintiff's answering those questions, the items would be returned.  The items that the Defendants took from the Radisson (i.e., not the cash or the jewelry) were stored at the DEA office until Brautigam brought them to the January 12 meeting with Plaintiff.

On January 12, Brautigam returned to the Radisson to meet with Plaintiff, and brought the briefcase containing documents, along with the laptop computer in a computer bag, and a plastic container of photos and documents.  He left the items in his vehicle.  When he arrived, he met two postal inspectors who also wanted to meet with Plaintiff.  Brautigam was prepared to return Plaintiff's items to him, if he could show that he was engaged in legitimate business transactions, rather than perpetrating a fraud or financial scheme.   When Brautigam advised Plaintiff that the postal inspectors also wanted to speak with him, Plaintiff left the Radisson without further discussion.  Immediately after Plaintiff refused to discuss the matter with Brautigam, Brautigam turned over to postal inspectors the items that the federal Defendants had taken from the Radisson.   Since January 12, 2004, the federal Defendants have not been in possession of these items.

On January 12, 2004, all of Plaintiff's clothing items were returned; Radisson

employees returned to Plaintiff all of the other items that had been left in room 614.  Plaintiff has testified that as of January 12, 2004, he was missing two rings, two laptops, two briefcases with documents, $16,000, and pictures.  His documents were ultimately returned to him in January of 2005.

On Wednesday, January 16, 2004, defendant Drew delivered to Martin a letter from the DEA, explaining that the Cleveland Police Department arrested Plaintiff for violating his parole, and asked the Radisson to release the cash and jewelry to Drew; the Radisson agreed.  The Radisson then transferred the following items to Drew, which had been in the safety deposit box: $14,000 cash, one Klaus Kobec watch, one diamond/gold studded ring, and one gold ring with four diamonds.  Defendant Drew took this property, to begin a federal forfeiture action.  He believed such action was warranted because of the drug dog's alert; Wendall Harris' narcotics convictions; and Plaintiff's use of Mr. Harris' car.

On January 29, 2004, Pennsylvania State Trooper Daniel Soroczak gave the cashier's check of $14,000.00 and jewelry to United States postal inspectors for possible federal forfeiture action.  On February 26, 2006, the check and jewelry were returned to Soroczak, because the Postal Service decided not to commence a forfeiture proceeding.  The next day, Defendant Drew transferred the cashier's check and jewelry for forfeiture processing through the DEA and United States Attorney's Office.  On March 19, 2004, forfeiture seizure notices for the cash and jewelry were mailed to Cook.  Over a month later, on or about April 23, 2004, Plaintiff filed a claim for the cash and jewelry, stating that he was their true owner.  On July

21, 2004, the United States Attorney's Office decided not to commence a forfeiture proceeding.  By letter of that date, the DEA was directed to return the seized property to Plaintiff.  Then, in September of 2004, the DEA gave the federal Defendants authorization to contact Plaintiff and return the property.  Brautigam had to find a time when both he and Plaintiff's attorney were available, and in November of 2004, Brautigam attempted to return the $14,000.00 in cash and jewelry to Plaintiff's attorney, who agreed to return the property to Plaintiff.  Plaintiff's attorney refused to sign a DEA Form 292, which contained a waiver of a right to sue.  Ultimately, the cash and jewelry were returned to Plaintiff's counsel on December 9, 2004.  Plaintiff had no contact with Defendant Drew at any time.

Plaintiff avers that he never received his laptop.  Defendants attach exhibits purporting to demonstrate the return of the laptop, but do not explain how they so demonstrate.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In considering a motion for summary judgment, the Court must examine the facts in a light most favorable to the party opposing the motion.  International Raw Materials, Ltd. V. Stauffer Chem . Co., 898 F. 2d 946, 949 (3d Cir. 1990).  The moving party bears the burden of demonstrating the absence of any genuine issues of material fact.  United States v.

12

Onmicare, Inc., 382 F. 3d 432 (3d Cir. 2004).  Rule 56, however, mandates the entry of judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.  Celotex Corp. v. Cattrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 265 (1986).

## III. DEFENDANTS' MOTION

In this action, Plaintiff brings his claims pursuant to Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971).[3]  To prevail on a Bivens claim, a plaintiff must demonstrate that a defendant, acting under color of federal law, deprived him of a right secured by the Constitution or laws of the United States.  Brown v. Philip Morris Inc., 250 F.3d 789, 800 (3d Cir. 2001).

### A. OFFICIAL CAPACITY CLAIMS

First, Defendants correctly argue that Plaintiff cannot maintain a Bivens claim against them in their official capacities. E.g., Buchanan v. United States, 1:05-CV-0887, 2007 U.S. Dist. LEXIS 21655, at *13 (M.D. Pa. Mar. 27, 2007).   Plaintiff may pursue his claims against Defendants in their individual capacities only, and judgment will be granted accordingly.

### B. QUALIFIED IMMUNITY

I next address Defendants' contention that they are entitled to qualified

---

[3]Although Plaintiff's Second Amended Complaint identifies the claims as made pursuant to 42 U.S.C. § 1983, his moving papers make clear that he now intends to proceed under Bivens.  This is an appropriate path, as "[s]tate police officers deputized as federal agents...constitute federal agents acting under federal law."  DeMayo v. Nugent, 475 F. Supp. 2d 110, 115 (D. Mass. 2007).

immunity from suit.[4]    Qualified immunity is to be addressed at the earliest stage in the litigation, as it is not a defense, but is "an entitlement not to stand trial or face the burdens of litigation."  Curley v. Klem, No. 05-4701, 2007 U.S. App. LEXIS 20213, at *22 (3d Cir. Aug. 24, 2007).  "The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." Mitchell v. Obenski, 134 Fed. Appx. 548, 550 (3d Cir. 2005).

"A court evaluating a claim of qualified immunity 'must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation.'" Hill v. Borough of Kutztown, 455 F.3d 225, 244 (3d Cir. 2006).  If a clearly established right has been violated, I must then consider whether, in light of the circumstances known to the officer at the time, a reasonable officer would have known that his conduct violated the right. Bartholomew v. Pennsylvania, 221 F.3d 425, 428 (3d Cir. 2000); see also Saucier v. Katz, 533 U.S. 194, 202, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001).  The inquiry must be undertaken in light of the specific context, and the totality of the circumstances. Curley, 2007 U.S. App. LEXIS 20213, at **18-19.   Moreover, a defendant's underlying intent or motivation is not relevant to the inquiry.  Id. at **19.

I will assess each violation alleged by Plaintiff against these standards.

---

[4]Although Defendants couch their arguments both as failure to establish a constitutional deprivation, and as qualified immunity, I will address them under the rubric of qualified immunity. I do so because lack of a constitutional deprivation is an element of the immunity analysis. Hill v. Borough of Kutztown, 455 F.3d 225, 244 (3d Cir. 2006).  Moreover, I note that Immunity principles arising under Section 1983 are equally applicable to a Bivens claim.  Wallace v. Abell, 217 Fed. Appx. 124, 127 n.3 (3d Cir. 2007).

14

1. Search and Seizure

I first consider whether Defendants are entitled to qualified immunity for the Fourth Amendment claim pertaining to the search and seizure of Plaintiff's items. Plaintiff appears to argue that because he had a subjective expectation of privacy, and advised hotel personnel that he would return on January 11, his rights in the room should be protected.[5]  I will accept as undisputed that Plaintiff had such a subjective expectation, and that, at some point, he manifested to hotel personnel an intention to return to the hotel on January 11.[6]

A subjective expectation of privacy is not, alone, sufficient to trigger the Fourth Amendment's protections.  United States v. Ferri, 778 F.2d 985, 994 (3d Cir. 1985).   Likewise, a manifestation of such an expectation is not, standing alone, sufficient.   Instead, a person challenging a search must manifest a subjective expectation of privacy in the property searched, and must have a reasonable expectation of privacy in that property.  United States v. Baker, 221 F.3d 438, 441 (3d Cir. 2000).  A subjective expectation of privacy, to be protected, must be "one that society is prepared to recognize as 'reasonable.'" Rakas v. Illinois, 439 U.S. 128, 143

---

[5]As it is undisputed that these Defendants did not participate in the search of the hotel room, it appears that Plaintiff intends to pursue a claim against these Defendants regarding their conduct vis-a-vis his property after it was removed from the hotel room.  To the extent that Plaintiff intends to state a claim against these officers for the initial search of the room, such a claim cannot stand, as Defendants were not involved in, or even aware of, that search.  See, e.g., Massi v. Hollenbach, No. 4:CV-06-0034, 2007 U.S. Dist. LEXIS 14787, at **9 (M.D. Pa. Mar. 2, 2007) .

[6]The Radisson Supplemental Report to which Plaintiff points as evidence of his manifested intent to return states that Plaintiff advised that he would return to the hotel on the 11th to settle his delinquent bill, rather than a generalized intention to return to the hotel.  In other words, this evidence indicates that the account was already delinquent at the time that Plaintiff advised that he would return on the 11th.

n.12, 58 L. Ed. 2d 387, 99 S. Ct. 421 (1978).  Such expectations of privacy typically arise from the right to exclude others. Id.

The central question here, then, is whether Plaintiff's subjective expectation of privacy in the hotel room was reasonable.  A paying guest enjoys a legitimate expectation of privacy, and accompanying rights, in his hotel room.  See  Stoner v. California, 376 U.S. 483, 490, 11 L. Ed. 2d 856, 84 S. Ct. 889 (1964).  Conversely, it is well-established that a guest does not have a reasonable or legitimate expectation of privacy in his hotel room after his rental period has terminated.  United States v. Kitchens, 114 F.3d 29, 31 (4th Cir. 1997) (collecting cases).[7]   In other words, society is not prepared to recognize as reasonable a nonpaying guest's expectation of privacy in a hotel room, and therefore no privacy rights inhere in that context.  In that case, after taking possession of a room for nonpayment, hotel personnel may lawfully consent to search of the room and articles found therein.  United States v. Rahme, 813 F.2d 31, 34 (2d Cir. 1987); Sullivan v. Stein, No. 3:03cv1203, 2005 U.S. Dist. LEXIS 20174, at **9-10 (D. Conn. Sept. 12, 2005).

Under the established law and the undisputed facts, Plaintiff has not stated a violation of his privacy rights here.  There is no dispute that Plaintiff had not, in fact, paid for the hotel room during the entire period of his absence.  He was, therefore, a non-paying guest, and his rental period had terminated, by the time hotel personnel entered the room and took possession of his belongings.  Plaintiff's

---

[7]In Kitchens, the court pointed out the possibility that a pattern or practice might make an expectation of privacy reasonable, even in the absence of payment. Kitchens, 114 F.3d at 32.  No such situation is present or alleged here.

attempts to argue that he was a paying guest, or was otherwise entitled to Fourth Amendment protections, are unpersuasive.

First, Plaintiff points to the fact that after Vento applied to Plaintiff's already-incurred costs the $2000.00 taken from the cash in Plaintiff's hotel room, the bill had been overpaid by $118.00.   It is undisputed, however, that the money was applied to Plaintiff's bill <u>after</u> the bill became delinquent and hotel employees had already entered the room; applying the money did not retroactively "cure" Plaintiff's failure to pay, or retroactively render him a paying guest at the pertinent time.   In addition, Plaintiff urges that due to the overpayment, he should be considered paid up for an additional day at the hotel's $69.00 rate.  This argument amounts to an assertion that the hotel was required, <u>sua sponte</u>, to apply the $118.00 overpayment toward an additional day of rental cost.  I have found no authority, and Plaintiff has offered none, that would impose such an obligation on the hotel.

Next, Plaintiff argues that he left $1000.00 with the hotel, to cover costs.  It is undisputed, however, as reflected in the very statement to which Plaintiff points as evidence of the cash payment, that the $1000.00 did not cover the costs incurred up to the point that the hotel Defendants entered the room.   Accordingly, at all pertinent times, Plaintiff must be deemed a non-paying guest without a reasonable expectation of privacy in the room.  He has not, therefore, alleged a deprivation of a constitutional right.

Even assuming <u>arguendo</u> that Plaintiff has alleged a constitutional deprivation, however, the Defendants remain entitled to qualified immunity from

suit.[8]   It is undisputed that Radisson employees represented to the federal Defendants that due to nonpayment, Plaintiff's possessions had been removed from the hotel room.   Although Brautigam's report states that he was told Plaintiff had indicated an intention to return to the hotel on January 11th, he was also told that Plaintiff had promised to call back with a different credit card for payment, and had never done so.  In other words, the federal Defendants were apprised only of facts indicating that the hotel Defendants properly removed Plaintiff's possessions due to nonpayment.  Plaintiff's intended return on January 11th does not alter the fact that his rental period terminated prior to that date.

There is nothing to suggest that the federal Defendants had reason to question or disbelieve the facts or representations offered them.  Under clearly established law, therefore, they could not have thought their conduct unlawful. Instead, a reasonable officer in possession of the facts known to the federal Defendants at the time would reasonably have thought that the Radisson legitimately entered room 614 and took control of its contents, and that hotel employees were therefore entitled to provide access thereto.   Therefore, the federal Defendants are entitled to qualified immunity on Plaintiff's Fourth Amendment claim.

2.  Continued Retention of Property

Next, I consider Defendants' argument that they are entitled to qualified

---

[8]Given the settled state of the law, it is clear that all of the pertinent principles and rights were clearly established at the time of the events alleged in this litigation.

immunity for retention of Plaintiff's property.

From the outset, I note that "[a] defendant in a civil rights action must have personal involvement in the alleged wrongs." Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988).  In other words, "[i]ndividual liability in a civil rights action is personal in nature, and a defendant is liable only if he was personally, affirmatively involved in the alleged malfeasance or approved of it." Massi v. Hollenbach, No. 4:CV-06-0034, 2007 U.S. Dist. LEXIS 14787, at **9 (M.D. Pa. Mar. 2, 2007).

Here, taking the facts in a light most favorable to Plaintiff, the Defendants took possession of the laptop and documents from the Radisson on January 10, 2004, and then gave them to postal inspectors on January 12, 2004.  The federal Defendants do not know what happened to the property thereafter.  It is undisputed that the laptop has not been in the federal Defendants' possession since January 12, 2004.

In addition, Plaintiff does not allege, or produce any evidence, that either Defendant intentionally or otherwise caused postal inspectors to withhold the property, or approved of its continued retention; nor does he allege that the Defendants' two-day possession of the computer violated any law, or that Defendants wrongfully gave the property to postal inspectors.  Moreover, Plaintiff has produced no facts that would permit a reasonable jury to reach such conclusions.  In sum, the record demonstrates Defendants' lack of involvement in the continued retention of the laptop.  Under these circumstances, Plaintiff cannot hold these Defendants responsible for a third party's permanent retention of the

property.  On that basis alone, Plaintiff has not established that Defendants violated a constitutional right.[9]

I reach a different conclusion, however, with respect to the temporary retention of Plaintiff's cash and jewelry.  Plaintiff has narrowed this claim to Defendants' continued retention of the items after the United States Attorney's office instructed them to return the property.[10]

It is true that under the Hudson/Parrat line of cases, an unauthorized intentional deprivation of property does not constitute a violation of the Due Process clause if a meaningful post-deprivation remedy for loss is available. See Hudson v. Palmer, 468 U.S. 517, 530-36, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984);  Parratt v. Taylor, 451 U.S. 527, 101 S. Ct. 1908, 68 L. Ed. 2d 420 (1981).  Pennsylvania has put in place, as a matter of common law and by rule of procedure, adequate post-deprivation remedies.  Taylor v. Naylor, No. 04-1826,  2006 U.S. Dist. LEXIS 27322, at *10 (W.D. Pa. Apr. 6, 2006).

An intentional and authorized deprivation, however, may constitute a due process violation, regardless of the adequacy of post-deprivation remedies. Parenti v. Ponte, No. 84-1871-WF, 1990 U.S. Dist. LEXIS 640, at *10 (D. Mass. Jan. 19, 1990).

---

[9]Even if I were to consider Defendant's involvement sufficient, there is no evidence that their part in the disappearance of the laptop was anything other than random and unauthorized. In that case, the matter would likely be disallowed as a negligence claim not cognizable under Bivens, or be disposed of by Hudson/Parrat principles. See Hudson v. Palmer, 468 U.S. 517, 530-36, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984);  Parratt v. Taylor, 451 U.S. 527, 101 S. Ct. 1908, 68 L. Ed. 2d 420 (1981)

[10]Plaintiff chronologically limits his claim, asserting that once Defendants "had been instructed to return the items to Cook, their continued possession of these items was unconstitutional."

Likewise, a temporary deprivation of property is a cognizable deprivation under the due process clause. Fuentes v. Shevin, 407 U.S. 67, 84-85, 92 S. Ct. 1983, 32 L. Ed. 2d 556 (1972). "An authorized deprivation is one carried out pursuant to established state procedures, regulations, or statutes." Piatt v. McDougall, 773 F.2d 1032, 1036 (9th Cir. 1985).

Examining the facts in the light most favorable to Plaintiff, and taking note of the record submitted by Defendants,[11] a reasonable jury could conclude that the decision not to release his property because of counsel's unwillingness to execute a hold harmless agreement, was "authorized," rather than a random, unauthorized decision. Indeed, for example, Defendants proffer absolutely no explanation or evidence pertinent to their treatment of Plaintiff's property between Brautigam's November, 2004 meeting with Plaintiff's counsel and the eventual return of the property. The undisputed record does not permit the conclusion that, as a matter of law, the retention of his jewelry and cash was of the type for which post-deprivation remedies are adequate; to the contrary, it is possible that the retention was accomplished pursuant to authorized procedure, and was a violation of due process. Defendants' arguments beyond this point are cursory, and they have not met their burden under either qualified immunity or Rule 56 standards. Accordingly, I will deny Defendants' Motion to that extent.

3. Racial Profiling - Equal Protection

Next, I address Defendants' entitlement to judgment on Plaintiff's claim of

---

[11]I refer, in particular, to Defendant's Exhibit S.

racial profiling in violation of the Constitution.  In order to make out a profiling claim under the Fourteenth Amendment, Plaintiff must establish that Defendants' actions had a discriminatory effect and were motivated by a discriminatory purpose. Bradley v. United States, 299 F.3d 197, 205 (3d Cir. 2002).  Plaintiff proffers neither evidence nor argument on this claim, and has therefore failed to raise any genuine issue of material fact.  I will enter judgment against him on that basis.

C. DAMAGES

Finally, Defendants claim entitlement to summary judgment because Plaintiff is unable to prove damages.  Defendants' argument is, however, flawed.  Even absent proof of actual injury, a constitutional violation is actionable for nominal damages.  Carey v. Piphus, 435 U.S. 247, 266, 55 L. Ed. 2d 252, 98 S. Ct. 1042 (1978). Therefore, I will not now evaluate Plaintiff's entitlement to damages, and will reject Defendants' argument.

III.  PLAINTIFF'S MOTION

Plaintiff has filed a Motion for Summary Judgment, seeking a determination that as a matter of law, Defendants violated his Fourth Amendment rights when they retained his laptop computer. In the first instance, Plaintiff's Second Amended Complaint pleads that the entering of his hotel room and subsequent search and seizure violated the Fourth Amendment; he does not purport to state a Fourth Amendment claim for the permanent dispossession of his computer.  Even if I were to view the Second Amended Complaint as stating such a claim, however, it cannot be sustained.  If the initial seizure was not unlawful, then permanent dispossession

22

of property is deemed a violation of the right of due process, rather than the Fourth Amendment. <u>See</u> <u>Wagner v. Higgins</u>, 754 F.2d 186, 194 (6th Cir. 1985) (Contie, J., concurring) (citing cases). As discussed <u>supra</u>, Plaintiff has not demonstrated that the initial search and seizure were unlawful.[12] Therefore, Plaintiff is not entitled to summary judgment on a Fourth Amendment claim based on the facts surrounding his computer. I will deny Plaintiff's Motion.

<u>CONCLUSION</u>

In sum, the federal Defendants are entitled to summary judgment on Plaintiff's claims based on the equal protection clause and the Fourth Amendment. There remains, however, a genuine issue of material fact regarding whether the retention of Plaintiff's cash and jewelry constituted a violation of due process. Plaintiff, moreover, has not established entitlement to judgment as a matter of law on a Fourth Amendment claim for retention of the laptop computer. An appropriate Order follows.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

<u>ORDER OF COURT</u>

AND NOW, this **19th** day of October, 2007, it is ORDERED that Defendants' Motion for Summary Judgment (Docket No. [68]) is GRANTED in part, and DENIED in

---

[12]Moreover, to the extent that his Motion could be considered under another constitutional provision, I have already rejected such a claim due to Defendants' lack of involvement in the violation.

part.  It is denied as to Plaintiff's due process claim for retention of his jewelry and cash, and granted in all other respects.   Plaintiff's Motion for Partial Summary Judgment (Docket No. [71]) is DENIED.

BY THE COURT:

/S/   Donetta W. Ambrose

Donetta W. Ambrose,
Chief U. S. District Judge