IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

PHILLIP COOK,                                )
                                             )
          Plaintiff,                         )
                                             )
     -VS-                                    )   Civil Action No. 06-83
                                             )
UNITED STATES DRUG ENFORCEMENT               )
ADMINISTRATION AGENT FRANK DREW,             )
in his individual capacity; and              )
PENNSYLVANIA STATE TROOPER                   )
JEFFREY BRAUTIGAM in his individual          )
 capacity,                                   )
                                             )
          Defendants.                        )

AMBROSE, Chief District Judge.

## OPINION and ORDER OF COURT

### SYNOPSIS

Before the Court is Defendants' Motion for Summary Judgment on Plaintiff's claim based on the temporary deprivation of property between the Government's decision not to commence forfeiture proceedings, and the eventual return of Plaintiff's property. The claim at issue is limited to the deprivation of property occurring between July 21, 2004, and December 9, 2004.

For the following reasons, Defendants' Motion will be granted.

### OPINION

**I. Facts**

The majority of the facts were recounted in my Order dated October 19,

2007, and I will not recite them again in their entirety. I will, instead, limit this account to additional facts pertinent to this Motion. The following facts are not in dispute; the parties disagree, however, as to their import. To ameliorate any confusion, I refer to persons other than the parties by reference to their affiliated agencies, rather than by their individual names or titles.

All forfeitures in Drug Enforcement Administration ("DEA") are processed centrally at DEA headquarters. The DEA accepted Plaintiff's case for administrative forfeiture. After property has been accepted for forfeiture at DEA headquarters, all decisions with regard to the administrative processing of that property are made at DEA headquarters, including the return of seized property. Plaintiff's money and jewelry were eventually transferred, on March 10, 2004, to the United States Marshall Service ("USMS"), which serves as custodian for assets seized by Department of Justice agencies.[1] The USMS has primary authority over the management and disposal of seized assets in its custody.

On or about April 23, 2004, about a month after forfeiture notices were mailed, Plaintiff filed a claim for the currency and jewelry with DEA headquarters. By letter dated July 21, 2004, Brautigam was advised by the United States Attorney's Office ("USAO") that it would not commence judicial forfeiture proceeding against the seized property, and that the DEA should "now" return

---

[1] As recounted in the October 19th Opinion and Order, Defendant Drew transferred the property to the DEA for forfeiture processing on February 27, 2004. Prior to this, the property had been given to US Postal Inspectors, who declined to commence forfeiture proceedings and returned the property on February 26, 2004.

2

the property to Plaintiff. The letter also states, "kindly call" Plaintiff's counsel and make arrangements to return the seized assets. Brautigam advised Drew, his supervisor, of the USAO's declination.

When the DEA Headquarters authorizes the return of seized property, the Asset Removal Group ("ARG") in the respective field office is responsible for handling the return of the property per the DEA headquarter's instructions. The ARG contacts the USMS to request release of the property, and relays information between the USMS, USAO, and DEA. In this case, the ARG received the USAO's declination letter on August 16, 2004, and forwarded it to the Philadelphia Office, which forwarded it to DEA headquarters for authorization to return the property. By letter dated September 2, 2004, counsel from the DEA Asset Forfeiture Section ("forfeiture counsel") advised an agent in the DEA Philadelphia Office that the agent was authorized to contact Plaintiff, through his lawyer, to return the property, and was to have a hold harmless agreement executed upon return of the property. On or about September 27, 2004, this letter was forwarded to the DEA Pittsburgh Field Office.

On October 19, 2004, the ARG advised the USMS that the DEA was ordered to return the seized property, that the USAO had declined forfeiture, and that the jewelry, which the USMS had housed in Texas, be returned to the Western District. Another letter to the Philadelphia Field Office from forfeiture counsel, dated November 4, 2004, stated authority to contact Plaintiff to return seized property. The ARG and the USMS then exchanged information regarding the

return of the currency, in which the USMS refused to release the currency based on the USAO's declination letter, and requested authorization from the DEA; Laughlin provided the September 2 authorization, and the USMS issued a voucher for the currency on November 18, 2004. The USMS advised the ARG that someone from DEA had to pick up the certified check.

On or about November 22, 2004, the ARG advised Brautigam that the seized property was available and ready for delivery.[2] He also informed Brautigam that when he returned the seized property, Plaintiff's counsel had to sign a hold harmless agreement, which the ARG provided to Brautigam. Until Brautigam received this notification, he had no affirmative involvement in the process of having the property released to the DEA by the USMS. Additionally, Brautigam was not responsible for contacting the USMS and requesting the release of the property.

Subsequently, on November 23, 2007, Brautigam advised Plaintiff's counsel that he could obtain the seized property from the USMS and return it. He also informed counsel that the DEA required him to execute a hold harmless agreement upon receipt of the seized property. Counsel informed Brautigam that he would not execute a hold harmless agreement. Brautigam had never had anyone refuse to execute such an agreement before. Therefore, "immediately," on the same day, Brautigam sought assistance from the USAO as to how to

---

[2]Elsewhere, there is a suggestion that Brautigam was so advised on November 21st, rather than the 22nd. Because the distinction is immaterial, and the parties agree that this event occurred "on or about November 22nd", I will refer only to the later date.

4

proceed because counsel would not sign the agreement. The USAO advised Brautigam that he should return the seized property even if counsel would not sign the agreement.

Also on the same day, Brautigam told the ARG that counsel would not sign the agreement. The ARG advised that he would seek guidance from the DEA, and did so on November 23rd. The DEA asset forfeiture section's lead attorney advised the ARG Brautigam should return the property without signature. Still on November 23, the ARG relayed this advice to Brautigam. Brautigam then contacted counsel, and told him that the property would be released even absent the signed agreement. Brautigam did not work from November 25, 2004 through November 30, 2004 due to the Thanksgiving holiday. Other than November 23, 2004, the next date that both Brautigam and counsel were both available to meet was December 9, 2004. At that time, the property was returned.

## II. Summary Judgment Standard

Summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, the Court must examine the facts in a light most favorable to the party opposing the motion. International Raw Materials, Ltd. v. Stauffer Chem . Co., 898 F. 2d 946, 949 (3d Cir. 1990). The moving party bears the

burden of demonstrating the absence of any genuine issues of material fact. United States v. Onmicare, Inc., 382 F. 3d 432 (3d Cir. 2004). Rule 56, however, mandates the entry of judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof. Celotex Corp. v. Cattrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 265 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson v. Liberty Lobby, 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Additionally, Local Rule 56.1 provides that facts are deemed admitted unless specifically denied or otherwise controverted by a separate concise statement of the opposing party.

### III. Defendant's Motion

Plaintiff terms his claim as one for "Fourth Amendment due process." As the Fourth Amendment and due process clause are separate and distinct, I will address the claim under both constitutional provisions.

### A. Personal Involvement

I first address Defendants' arguments, made in the immunity context, regarding the lack of personal involvement in the alleged constitutional violations.

"A defendant in a civil rights action must have personal involvement in the alleged wrongs." Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988). "[A]

6

defendant is liable only if he was personally, affirmatively involved in the alleged malfeasance or approved of it." Massi v. Hollenbach, No. 4:CV- 06-0034, 2007 U.S. Dist. LEXIS 14787, at **9 (M.D. Pa. Mar. 2, 2007). Section 1983 does not permit respondeat superior liability. E.g., Baraka v. McGreevey, 481 F.3d 187, 210 (3d Cir. 2007). A person "cannot be held responsible for a constitutional violation which he...neither participated in nor approved." C.H. ex rel. Z.H. v. Oliva, 226 F.3d 198, 201 (3d Cir. 2000).

Accepting the facts in a light most favorable to Plaintiff, Defendant Drew's involvement in the events alleged amounts to his initial receipt of Plaintiff's property; his subsequent conversation with the USAO, apparently in June of 2004, in which it was decided that Plaintiff's property would be returned to him; and Brautigam's advising him of the USAO's declination.[3] Plaintiff does not argue that the initial receipt of the property was in any way illegal, nor does he challenge the legality of the June, 2004 conversation. Moreover, there is absolutely no evidence that Drew approved of or acquiesced in the allegedly illegal conduct at issue here. The undisputed facts simply do not permit the conclusion that Drew was sufficiently involved in the treatment of Plaintiff's property after June of 2004. Similarly, there is no evidence that he was able to control the actions of the custodial and other organizations that allegedly delayed the property's

---

[3]Plaintiff suggests that Drew was involved with the USAO's July 21, 2004 decision to return the property. The evidence cited, however, relates to June of 2004. Moreover, even if Drew had been involved in the July 21, 2004 decision, Plaintiff does not challenge the lawfulness of that decision; to the contrary, he charges that the July 21st directive was carried out in an unlawful manner.

7

return. Drew cannot, therefore, be held liable for Plaintiff's alleged damages.

On similar grounds, a claim cannot lie against Brautigam for the retention of Plaintiff's property between July 21, 2004, and November 22, 2004. The undisputed facts might well establish, in Plaintiff's words, that "layers of administrative bureaucracy and internal inefficiencies delayed any attempt" to return the property. The facts do not, however, demonstrate that Brautigam was in any way involved – by action or acquiescence -- in the process by which the property wended its way through the custody or authority of the USMS, the USAO, and various DEA offices. Likewise, there is no evidence that he had any control over, or responsibility for, that process. Although the forfeiture system may indeed be broken, or wrongfully slow, the actors that make up that system are not defendants to this action. Plaintiff is correct that Defendants' undisputed "excuses" do not invalidate constitutional obligations; but those apologia do make clear that the obligations belonged to third parties to this litigation. Brautigam cannot be made to stand as their proxy. Brautigam was not advised until November of 2004 that the seized property was accessible to him, from the USMS. He cannot be liable for the conduct of third parties occurring before that time.

### B. Qualified Immunity

I next address Defendants' argument that Brautigam is entitled to qualified immunity on the claim against him. Given my finding that Brautigam cannot be liable for the retention of Plaintiff's property prior to November 22, 2004, I will

limit the analysis to events occurring after that date.

On this point, I restate the law identified in my October 17 Order. "A court evaluating a claim of qualified immunity 'must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all....'" Hill v. Borough of Kutztown, 455 F.3d 225, 244 (3d Cir. 2006).[4]

If Plaintiff has alleged the deprivation of a constitutional right, I must "proceed to determine whether that right was clearly established at the time of the alleged violation.'" Id. at 244. In order to assess whether a right was "clearly established," the court must consider "the specific context of the case, not [whether the right was clearly established] as a broad general proposition." Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001).

"The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. (citations omitted). "'This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful,... but it is to say that in the light of pre-existing law the unlawfulness must be apparent.'" Hope v. Pelzer, 536 U.S. 730,

---

[4]This inquiry, of course, impacts the validity of Plaintiff's prima facie case. As our Court of Appeals has noted, it is unclear "whether a court must determine the issue of whether there has been a constitutional violation before reaching the qualified immunity question, or whether that inquiry is the first part of a two-pronged test for qualified immunity." Wright v. City of Philadelphia, 409 F.3d 595, 600 (3d Cir. 2005).

9

739, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002) (citations omitted). As such, fair warning exists if "'prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights.'" Id. at 740.

If a clearly established right has been violated, I must then consider whether, in light of the circumstances known to the officer at the time, a reasonable officer would have known that his conduct violated the right. Bartholomew v. Pennsylvania, 221 F.3d 425, 428 (3d Cir. 2000). The inquiry must be undertaken in light of the specific context, and the totality of the circumstances. Curley v. Klem, 499 F.3d 199, 207 (3d Cir. 2007). Moreover, a defendant's underlying intent or motivation is not relevant to the inquiry. Id. at **19. "The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." Mitchell v. Obenski, 134 Fed. Appx. 548, 550 (3d Cir. 2005).

### 1. Due Process

Plaintiff does not develop his claim under the auspices of due process. Because he does cursorily address it, however, I will assume he intends to press this aspect of the claim and will address it first.[5]  While there is no question that a deprivation of property occurred here, I remind the parties that "a deprivation of property is actionable under section 1983 only when it is accomplished without due process of law." Wall v. City of Brookfield, 406 F.3d 458, 460 (7th Cir.

---

[5]My October 19th Order suggests that Plaintiff may press only a due process claim, and not a Fourth Amendment claim, with respect to the temporary deprivation alleged. The body of the October 19 Opinion, however, did not expressly preclude a Fourth Amendment claim as to the temporary deprivation. Therefore, I will now consider that claim.

2005).

In my October 19, 2007 Order, I relayed that an intentional, unauthorized deprivation of property cannot, under the circumstances here presented, constitute a due process violation; only an authorized, intentional deprivation would create a cognizable claim. This well-settled rule is borne of common sense: "[W]hen deprivations of property are effected through random and unauthorized conduct of a state employee, pre-deprivation procedures are simply 'impracticable' since the state cannot know when such deprivations will occur." Hudson v. Palmer, 468 U.S. 517, 532, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984). If the deprivation is effected pursuant to established state procedures or regulations, then the state is expected to anticipate the deprivation, and provide appropriate pre-deprivation process. Id. "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." Morrissey v. Brewer, 408 U.S. 471, 481, 92 S. Ct. 2593, 33 L. Ed. 2d 484 (1972).

Before determining that post-deprivation remedies do not satisfy the requirements of due process, therefore, Plaintiff would bear the burden of showing, inter alia, that Brautigam was "authorized" to withhold the property, or that Brautigam otherwise failed to provide him with process due him.

Under the undisputed facts, a reasonable jury could not conclude that the deprivation was authorized, and that pre-deprivation process was required. The crux of Plaintiff's argument is that Defendants "failed to actively pursue" the USAO's directive, in July, to return the property. Plaintiff argues that Brautigam

<u>failed</u> to follow procedure, because he did not like the advice that he return the property "now"; similarly, after he was advised by both forfeiture counsel and the USAO to return the property, Plaintiff complains that Brautigam waited too long, and should have returned the property on November 23rd. Accordingly, his conduct in retaining the property can only be characterized as unauthorized. Plaintiff does not argue or establish, either as a matter of fact or law, that Brautigam was told or otherwise authorized to retain the property. Plaintiff's cursory statement that the delay was "authorized by the DEA" is simply insufficient here. Plaintiff points to no facts of record – for example, no pertinent DEA rule, regulation, or procedure – that supports his position.

Moreover, regardless of the nature of Brautigam's decision, Plaintiff does not apprise the Court what process he should, allegedly, have received in this case. Under the circumstances, it would have been impracticable, at best, for Brautigam to have provided a pre-deprivation hearing for the pertinent time period. Furthermore, Plaintiff does not argue that post-deprivation procedures are inadequate. For these reasons, as a matter of law, there is no genuine issue of material fact that Pennsylvania's post-deprivation procedures were adequate to protect Plaintiff's constitutional rights; there was no greater process due, and no constitutional violation. For that reason, Brautigam is entitled to qualified immunity on Plaintiff's claim for due process.

Even if there had been a constitutional violation, it is difficult to argue that the right claimed here was clearly established. Neither Plaintiff nor Defendant

points to law on this issue, and I note the relative scarcity of persuasive precedent regarding the temporary retention of property. Likewise, I cannot find any authority that would, clearly or otherwise, have apprised Brautigam that he should provide Plaintiff with process at any time between November 22 and the return of the property.

Even assuming that a clearly established right had been violated, however, I would still find Brautigam entitled to qualified immunity here. In that case, I would be required to consider whether, in light of the circumstances known to the officer at the time, a reasonable officer would have known that his conduct violated the right. The undisputed facts demonstrate that Brautigam had access to the property on November 21, and contacted counsel on the 22nd to arrange for its return; he had been advised to obtain a signed hold harmless agreement; had never been refused a signature in the past; sought and received the advice of the USAO that same day; and then contacted Plaintiff's counsel that day to advise him that the property would be returned even absent the agreement. Other than that day, the next time that both Brautigam and counsel were available to meet was on December 9, when the property was ultimately returned. Under the facts of record, it would be absurd to find that a reasonable officer in Brautigam's position could have thought that his conduct between November 22nd and December 9th violated any constitutional right.

### 2. Fourth Amendment

I next address Plaintiff's contention, on which Plaintiff's emphasis rests,

that the retention of property violated the Fourth Amendment.

In doing so, I look first to whether Plaintiff has established a constitutional violation. To establish a Fourth Amendment violation, a plaintiff must show that Defendant's actions constituted a search or seizure within the meaning of the Fourth Amendment, and that those actions were "unreasonable." Open Inns v. Chester County Sheriff's Dep't, 24 F. Supp. 2d 410, 424 (E. D. Pa. 1998). In the first instance, it is not at all clear that Plaintiff can demonstrate that a "seizure" occurred, as only the eventual retention of the property, and not the initial seizure, is in dispute. Compare Shaul v. Cherry Valley-Springfield Cent. Sch. Dist., 363 F.3d 177, 187 (2d Cir. 2004) with Fox v. Van Oosterum, 176 F.3d 342 (6th Cir. 1999).[6] As stated in a different context: "There are many instances in which the lawful seizure of property necessarily results in a brief delay before its return. It makes little sense to treat each of those delays as an actionable violation of the Fourth Amendment." Britton v. Maloney, 196 F.3d 24, 35-36 (1st Cir. 1999).

To the extent that he can meet that requirement, however, the touchstone of the Fourth Amendment is whether the "seizure" – here,

---

[6] Plaintiff relies heavily on Krimstock v. Kelly, 306 F.3d 40 (2d Cir. 2002), which noted that retention of seized property may violate the Fourth Amendment if the government is unable to establish probable cause for the initial seizure. In this case, the legality of the initial seizure is not at issue; Krimstock, therefore, is inapplicable.

I am likewise unpersuaded by Hansen v. Schubert, NO. CIV. S-02-0850 FCD GGH, 2007 U.S. Dist. LEXIS 24094 (E.D. Ca. Apr. 2, 2007), which involved a due process claim based on the government's retention of computers seized during a raid. The Hansen Court entertained - but rejected in the presence of adequate post-deprivation remedies – a procedural due process claim, and then found a substantive due process claim precluded because the retention of property should be addressed under the Fourth Amendment. The latter conclusion is cursory, unexplained, and reliant on inapplicable cases. The cases that the Hansen court relied on for this proposition do not address the retention of property. To the contrary, the cases address, for example, the right to be free from criminal prosecution, and the use of excessive force.

Brautigam's treatment of the property between November 22 and December 9 – was reasonable. E.g., Bruton v. Paesani, 162 Fed. Appx. 151, 153 (3d Cir. 2006). This inquiry entails "an objective assessment of an officer's actions in light of the facts and circumstances then known to him.." Scott v. United States, 436 U.S. 128, 137, 98 S. Ct. 1717, 56 L. Ed. 2d 168 (1978). "[T]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." Bell v. Wolfish, 441 U.S. 520, 559, 60 L. Ed. 2d 447, 99 S. Ct. 1861 (1979). For the reasons discussed above, under the undisputed facts, no reasonable jury could find unreasonable the time period or circumstances of retention for which Brautigam is responsible. Accordingly, Plaintiff cannot demonstrate that a constitutional violation occurred. This is decisive, as fatal to either his prima facie case or his anti-immunity analysis.

Moreover, I would find Defendant entitled to immunity even if I were to proceed with the remainder of the inquiry. As noted above, authority is scarce regarding the Fourth Amendment parameters for retaining legally seized property. Plaintiff points to case law suggesting that at some indefinite point in time, continued retention converts a legal seizure into an illegal one.[7] He points to no authority, however, that would clearly or reasonably permit one to pinpoint illegality in this case. Similarly, Plaintiff, citing to one inapplicable case, maintains that probable cause was required to justify retaining the property. I

---

[7] For example, Plaintiff recounts that property retained for an undefined "extensive" period – not at issue here, certainly–may give rise to a Fourth Amendment violation.

15

simply cannot find that the law reasonably warned an officer in Brautigam's position that the circumstances of this case required probable cause. Additionally, as discussed in the due process context, above, no reasonable officer in Brautigam's position could have known that his retention of the property was unlawful.

## CONCLUSION

In sum, viewing the facts in a light favorable to Plaintiff, Defendants have established that there are no genuine issues of material fact that preclude the entry of judgment in their favor. Plaintiff may indeed have suffered a constitutional wrong; if so, however, it was not at the hands of these Defendants. This decision renders moot all other matters pending in this case. An appropriate Order follows.

## ORDER

AND NOW, this 4th day of January, 2007, it is hereby ORDERED, ADJUDGED, and DECREED that Defendants' Motion for Summary Judgment [Docket No. 92] is GRANTED. Plaintiff's Motion in Limine [Docket No. 97] is DENIED as moot. The clerk shall mark this matter CLOSED.

BY THE COURT:

/s/Donetta W. Ambrose___
Donetta W. Ambrose
Chief U.S. District Judge